STATE OF LOUISIANA, et al.,
Plaintiffs-Appellants,

v.

Colonel Robert C. LEE, et al.,
Defendants-Appellees.

No. 84–3699.

United States Court of Appeals,
Fifth Circuit.

April 29, 1985.

William J. Guste, Jr., Atty. Gen., William
G. Davis, Baton Rouge, La., Nicholas C.

Yost, Washington, D.C., for plaintiffs-appellants.

John R. Peters, Jr., New Orleans, La., for Pontchartrain, et al.

John Volz, U.S. Atty., William F. Baity, AUSA, New Orleans, La., Edward J. Shawaker, Robert L. Klarquist, U.S. Dept. of Justice, Washington, D.C., for Lee, Bratton, Gianelli & Marsh.

Joseph E. LeBlanc, Jr., New Orleans, La., for La. Materials.

James A. Burton, Frank J. Peragine, New Orleans, La., for Radcliff.

Before CLARK, Chief Judge, GOLDBERG, and TATE, Circuit Judges.

CLARK, Chief Judge:

Plaintiffs appeal the district court's summary judgment dismissing their claim that the National Environmental Policy Act (NEPA) required the U.S. Army Corps of Engineers (Corps) to complete an environmental impact statement before renewing six permits for shell dredging in Louisiana waters. We vacate and remand.

## I

In 1982 the Corps, pursuant to the Rivers and Harbors Act, 33 U.S.C. § 403, and the Clean Water Act, 33 U.S.C. § 1344, renewed six five-year permits allowing the holders to dredge for shells in the Louisiana Gulf Coast area, which consists of the Gulf of Mexico, East and West Cote Blanche, Four League Bay, and Vermillion Bay, as well as in Lake Pontchartrain and Lake Maurepas. Before issuing the renewals, the Corps performed the environmental assessment mandated by the Council on Environmental Quality NEPA Regulations, 40 C.F.R. § 1508.9. After reviewing this assessment the Corps concluded that NEPA did not require preparation of an impact statement and instead issued a find-

ing of no significant impact under 40 C.F.R. § 1508.13.

Plaintiffs, five private environmental groups[1] and the state of Louisiana, then filed this suit seeking (1) a declaratory judgment that the renewal of the permits without preparation of an impact statement violated NEPA and (2) an injunction requiring the Corps to rescind the permit extensions and to prohibit further dredging until an adequate impact statement is prepared. Four of the companies who had received the extensions, Radcliff Materials, Inc., Louisiana Materials Company, Inc., Pontchartrain Materials Corp., and Pontchartrain Dredging Corp., intervened as defendants pursuant to Fed.R.Civ.P. 24.

After plaintiffs moved for summary judgment, the Corps responded with a motion to suspend the court proceedings and remand the record for further consideration by the Corps. The court granted the Corps's motion, but allowed only about nine weeks for the reconsideration. At the end of this period the Corps filed a revised environmental assessment and findings of fact and again entered a finding of no significant impact. The Corps's simultaneous motion to remove the 1982 environmental documents from the record was denied.

Both parties then moved for summary judgment. The district court granted defendants' motion and dismissed plaintiffs' action.

## II

On appeal plaintiffs maintain that the district court's order was erroneous because defendants failed to establish that there was no material dispute as to whether the Corps was reasonable in concluding that no significant environmental impact would result from continuing the dredging. They also assert that the judge should not have considered the restrictive conditions imposed on the permits in reviewing the

---

1. Save Our Coasts, Inc., The Orleans Audubon Society, Sierra Club, Manchac Fisherman's Association, and the Environmental Defense Fund.

Corps's decision. Finally they ask us to order the district court to enter summary judgment in their favor and for an injunction against further dredging until the impact statement is completed.

## A

NEPA requires the preparation of an impact statement whenever a major federal action significantly affecting the quality of the human environment is proposed. 42 U.S.C. § 4332(C). The district judge stated that the NEPA regulations prepared by the Council on Environmental Quality indicated that the Corps's decision on extending these permits constituted "major federal action." 596 F.Supp. 645, 651 n. 7 (E.D.La. 1984). At oral argument before the district court, the attorney representing the Corps stated that he was not asserting the decision did not represent major federal action. Therefore, the only question presented is whether continuation of the dredging will have a significant impact on the human environment.

### 1.

All parties agree that unrestricted dredging would have a significant environmental effect. 596 F.Supp. at 655. The defendants contend, however, that the restrictive conditions imposed on the dredging permits reduce the effect below the level of significance. Plaintiffs assert that these restrictions should not be considered in assessing the impact of the dredging and, in the alternative, even if they are considered the dredging will still have a significant effect on the human environment. For their first point they rely on an interpretive document issued by the Council on Environmental Quality, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations." 46 Fed.Reg. 18,026 (1981). In this document the Council stated: "[m]itigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation or submitted by an applicant or agency as part of the original proposal." *Id.* at 18,038.

The district court correctly concluded that plaintiffs' reliance on this document is misplaced. Although the NEPA regulations issued by the Council are binding on all federal agencies, this publication is not a regulation, but merely an informal statement. Therefore, it is not a controlling authority. *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C.Cir.1982). Second, despite the Council's statement that this document did not impose any additional requirements beyond those contained in the NEPA regulations, 46 Fed.Reg. at 18,026, the underlying regulations cited by the Council, 40 C.F.R. §§ 1508.8 and 1508.27, do not discuss the propriety of considering mitigating conditions. 685 F.2d at 682–83. Finally, NEPA was intended to address reality, not a hypothetical situation. The conditions at issue are embodied in the permits themselves. This is not an instance where the proposed mitigating conditions consist of vague statements of good intentions by third parties not within the control of the agency. In *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 860 (9th Cir.1981), the court properly concluded that such tenuous assurances could not be considered as mitigating the significance of the environmental effects. Rather, here the conditions are legally enforceable by the Corps. The dredging must be conducted in accordance with these restrictions. Therefore, the only realistic course of action is to consider the conditions in reviewing the Corps's decision not to file the impact statement.

### 2.

Judicial review of an agency's decision not to file an environmental impact statement is governed by the rule of reasonableness. "The standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and made in good faith on a reviewable environmental record. 'If the decision is reasonable, the determination must be upheld.'" *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 644 (5th Cir.1983) (quoting *Save the Bay, Inc. v. U.S. Corps of Engineers*, 610 F.2d 322, 325

(5th Cir.), *cert. denied,* 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980); *e.g., Vieux Carre Property Owners, Residents & Associates v. Pierce,* 719 F.2d 1272, 1279 (5th Cir.1983). Under this standard

> the court must determine whether the plaintiff has alleged facts which, if true, show that the recommended project would materially degrade any aspect of environmental quality.
>
> \*   \*   \*   \*   \*   \*
>
> If the court concludes that no environmental factor would be significantly degraded by the project, [defendants'] determination not to file the impact statement should be upheld. On the other hand, if the court finds that the project *may* cause a significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement or grant [plaintiffs] such other equitable relief as it deems appropriate.

*Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466–67 (5th Cir.1973) (emphasis added).

To facilitate NEPA's basic purpose, we utilize this more rigorous standard rather than the rule of arbitrary and capricious review that ordinarily governs agency actions. This ensures that the environmental effects of a proposal are considered "to the fullest extent possible." *Id.* at 466. An environmental impact statement is intended to detail the environmental and economic effects of any proposed federal action so that those not directly involved can understand and give meaningful consideration to and make appropriate comment on the factors involved. It also ensures that the decisionmaker gives serious weight to environmental factors in making discretionary choices. *Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir.1975). *See Sierra Club v. Sigler,* 695 F.2d 957, 964–65 (5th Cir.1983). The private defendants argue that the environmental assessments prepared in this case were so exhaustive as to be the "functional equivalent" of an impact statement. This argument overlooks the fact that the

procedural requirements of NEPA governing the filing of impact statements were not met. Any decision based on an environmental assessment alone is necessarily more speculative than one made after the preparation and full consideration required by an impact statement. Therefore, when such a decision places a given proposal beyond the purview of NEPA, it must be inspected under the searching standard described above. *Save Our Ten Acres,* 472 F.2d at 465–66.

### 3.

■ In the case before us, the district court correctly required the plaintiffs to demonstrate the necessity of an impact statement. *Save Our Wetlands,* 711 F.2d at 644. However, the district court also stated that an impact statement was to be required "if the [environmental assessment] reveals that the quality of human environment *would be* significantly degraded by the proposed action...." 596 F.Supp. at 651 (emphasis added). This language indicates that the district judge subjected plaintiffs to an improper evidentiary burden. The court appears to have required plaintiffs to prove a significant degradation of the environment actually would result before the Corps's conclusion could be deemed unreasonable. Such a standard would be unrealistic. Plaintiffs would have to prove an absolute without the benefit of the factual basis Congress intended to provide by an impact statement.

In defining its standard, the district court relied on the following statement from *Save Our Wetlands:* "The burden is on the plaintiff attacking the 'no impact statement' decision to show that the quality of the human environment would be significantly degraded by the project. 711 F.2d at 644 (citing *Save Our Ten Acres,* 472 F.2d at 466–67). The purpose of this sentence was to reflect the holding in *Save Our Ten Acres.* It would have been more accurate had it read "the quality of the human environment *may* be significantly degraded." *Wetlands* was not intended as a change of the standard of review set forth in *Ten Acres,* which remains the con-

trolling precedent on this question in our circuit. Under *Save Our Ten Acres*, plaintiffs must establish only that the Corps was unreasonable in concluding there was no reasonable possibility that the proposed action would significantly degrade any environmental factor.

Because the agency's decision that an impact statement is not required pretermits the fact-gathering process designed by Congress, its decision, not plaintiffs' contentions, must be reviewed to determine if it reasonably supports an absolute. Such a procedure is consistent with the regulation defining an agency's finding of no significant impact: " 'Finding of no significant impact' means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.-4), *will not* have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13 (emphasis added).

### 4.

Based on the record before us, we cannot say that the district court would have granted summary judgment to defendants under the correct standard. The following are some examples of the environmental effects discussed in the record. The dredging will affect over two million acres of ecologically fragile water and wetland. By its very nature the dredging process is environmentally disruptive. A barge equipped with an excavating cutter-head digs through the shell deposits in reefs typically buried under four to eight feet of sediment. The shells are recovered through hydraulic suction. Other matter collected with the shells is diluted with wash water and then discharged. As the discharge settles, it creates an inorganic gel which spreads across the bottom and can suffocate benthic or bottom-dwelling life, such as vegetation or oysters. Nektonic life, (fish, crabs, or shrimp) can be affected if, as alleged, the water quality is lowered by the dredging or if it disrupts their food supply. The process also increases the turbidity of the water, thereby reducing the light available for photosynthesis. Furthermore, it can also interfere with the process of delta-building in the Atchafalaya River and with the health of living reefs and the formation of new reefs. The Corps has deemed the process sufficiently disruptive to prepare impact statements for dredging in Texas, Florida, and Alabama—each of which produces less shell than Louisiana.

The administrative record shows that plaintiffs introduced evidence that the restrictions in the permits are insufficient to render the environmental effects insignificant and the Corps introduced evidence to the contrary. The Corps correctly asserts that the mere existence of differing opinions does not make its decision erroneous. Nevertheless, the district court must review the evidence carefully to ensure that the Corps was reasonable in concluding that there is no possibility that the dredging *may* cause a significant degradation of some environmental factor.

The many differences between the 1982 and 1984 environmental assessments also raise questions. The 1984 document reaches conclusions opposite to many of those reached in the 1982 report. Every change tends to minimize the environmental significance of the continuation of the dredging. The record leaves the reasons for these changes unclear. Plaintiffs maintain that the conditions imposed by the 1984 permits are similar in many respects to those in place in 1982 and even in the 1977 permits. The defendants did not respond to plaintiffs' assertion that the changes in the conditions were insufficient to warrant the changes made in the environmental assessment. We reach no conclusion as to the validity of the 1984 assessment, but remind the district court that, to some extent, the 1984 assessment is a *"post hoc* rationalization and thus must be viewed critically." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 826, 28 L.Ed.2d 136 (1971).

Defendants maintain that the only question is whether the continued dredging will affect the status quo as it exists after fifty

years of dredging. Particularly with respect to the benthic life in Lake Pontchartrain, they assert that the damage to benthic life was completed in the 1950's and so the effects of further dredging cannot be considered significant.

The district court, relying on *Sierra Club v. Hassell,* 636 F.2d 1095, 1099 (5th Cir.1981), accepted this argument, at least for the purpose of determining that the Corps was reasonable in concluding that the effect of dredging on Lake Ponchartrain's benthic life was insignificant. 596 F.Supp. at 657. However, *Hassell* is inapposite. It presented the question of whether the environmental impact of rebuilding a bridge destroyed by a hurricane should be assessed by analyzing its impact in comparison with the environmental status when the old bridge was in place or with the status during the brief interim after the bridge was destroyed. Our decision that the comparison should be with the conditions existent when the old bridge was in place was premised on the conclusion that the reconstruction would only restore an environmental status quo that had existed for twenty-four years prior to the hurricane. 636 F.2d at 1099.

This logic is not applicable to the present case. The renewal of these permits will not maintain a status quo, but rather will continue a course of environmental disruption begun years ago. The fact that much damage to the benthic life occurred years ago does not automatically render the effect of the continued dredging insignificant. Such a conclusion would ignore the realities that even a badly damaged body of water may restore itself to ecological health if a disruptive activity is halted and that continued dredging may expand the areas of damage. In deciding this case on remand, the trial court should compare the projected ecological status of the affected areas if the dredging is continued for another five years with their projected condition if the dredging is halted now.

The order granting summary judgment is vacated. The case is remanded for reconsideration under the standard of *Save Our Ten Acres.*

B.

This decision makes it unnecessary to reach plaintiffs' arguments for the entry of summary judgment in their favor and for an injunction against further dredging until the impact statement is prepared. The first of these matters must await the district court's reconsideration of its original decision and the second must be addressed to that court at an appropriate time.

III

Nothing said in this opinion is intended to intimate what decision the district court should reach as a result of applying the proper standard to the proof or whether that court may decide that further proof may be necessary. The order of the district court is vacated and the cause is remanded for proceedings consistent with this opinion.

**VACATED and REMANDED.**