SAVE SAN FRANCISCO BAY ASSOCIA-
TION, a nonprofit corporation; Golden
Gate Audubon Society, Inc., a nonprofit
corporation; and Citizens for Alame-
da's Last Marshlands, an unincorporat-
ed association, Plaintiffs,

v.

John O. MARSH, Secretary of the Army;
Robert K. Dawson, Assistant Secretary
of the Army for Civil Works; Patrick
Kelley, Division Engineer, South Pacif-
ic Division, U.S. Army Corps of Engi-
neers; Andrew M. Perkins, Jr., District
Engineer, San Francisco District, U.S.
Army Corps of Engineers; City of Oak-
land; Port of Oakland; Board of Port
Commissioners of the Port of Oakland,
Defendants.

Nos. C–86–5817 RHS, C–86–6023 RHS.

United States District Court,
N.D. California.

May 11, 1988.

PEOPLE of the State of California, ex
rel. John K. VAN DE KAMP, Attorney
General of California, and the Califor-
nia Regional Water Quality Control
Board (San Francisco Bay Region),
Plaintiffs,

v.

John O. MARSH, Secretary of the Army;
Robert K. Dawson, Assistant Secretary
of the Army for Civil Works; Patrick
Kelley, Division Engineer, South Pacif-
ic Division, U.S. Army Corps of Engi-
neers; Andrew M. Perkins, Jr., District
Engineer, San Francisco District, U.S.
Army Corps of Engineers; City of Oak-
land; Port of Oakland; Board of Port
Commissioners of the Port of Oakland,
Defendants.

John K. Van de Kamp, Atty. Gen. of State of Cal., Theodora Berger, Ass't Atty. Gen., Susan L. Durbin, David W. Hamilton, Deputy Attys. Gen., San Francisco, Cal., for plaintiffs.

Winifred Berman, Shute, Mihaly & Weinberger, San Francisco, Cal., for Save San Francisco Bay Ass'n, Golden Gate Audubon Society, Inc., Sierra Club, Inc., Citizens of Alameda's Last Marshlands.

Frank Boone, San Francisco, Cal., Gerald Fish, Scott A. Schachter, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for Federal defendants.

Richard Winnie, City Atty., City of Oakland, Oakland, Cal., for City of Oakland.

Stanley P. Hebert, Port Atty., Thomas D. Clark, Asst. Port Atty., Port of Oakland, Oakland, Cal., Gary Baise, Benjamin Wilson, Amy Comstock Burton, Beveridge & Diamond, P.C., Washington, D.C., for Port of Oakland.

John H. Eft, Dist. Counsel, Dept. of the Army, San Francisco Dist. Corps of Engineers, San Francisco, Cal., for U.S. Army Corps of Engineers.

## OPINION

SCHNACKE, District Judge.

### A. JURISDICTION

The Court has subject matter jurisdiction over these claims because these civil actions arise under the laws of the United States [See, 28 U.S.C. § 1331].

### B. FACTS

The Oakland Airport (the "Airport") project site is located immediately adjacent to existing airport facilities on diked, nontidal baylands. The project site is made up of seasonal wetlands which provide feeding and resting habitat for migratory shorebirds and waterfowl during the winter. Additional birds and wildlife use the wetlands year-round.

Defendant Port of Oakland (the "Port") applied to the Army Corps of Engineers (the "Corps") in 1981 for a permit to fill part of the wetlands at the Airport. Modified applications were submitted for 373– and 435–acre fill permits between 1981 and 1985. The Corps approved the 435–acre fill permit on February 14, 1985. The Airport wanted to use the filled land for expanded air cargo handling facilities for United Parcel and Federal Express and approximately 120 acres were required for this project. The Corps planned on using the additional land for rental car parking, corporate aircraft parking and maintenance, a telecommunications facility, a third commercial air terminal, and other ancillary facilities.

The Corps proposed mitigation for the loss of wetlands by acquiring and dedicating to the California Department of Fish and Game ("Cal.F & G"), a 461–acre parcel of land adjacent to the American Canyon landfill (the "Zunino property") in Napa County. The Port proposed the development of an enhancement plan for the Zunino property for the purpose of converting uplands on the property into marsh habitat.

On July 16, 1985 the Corps issued a public notice requesting comments from governmental agencies and the public. The Corps prepared an Environmental Assessment ("EA") of the project, and determined that an Environmental Impact Statement ("EIS") was not necessary. The Corps did not hold any public hearings on the project.

The Corps received comments from public agencies, environmental organizations, and individual citizens. The Environmental Protection Agency ("EPA") recommended an EIS be prepared for the project, and initially EPA recommended the Corps deny the permit. However, on July 21, 1986, EPA stated that the project was environmentally satisfactory. During the comment period, Cal.F & G recommended the Corps not issue a permit, but Cal.F & G later agreed to the mitigation plan.

At the close of the comment period, mitigation concerns were left unanswered, and the Fish and Wildlife Service and the EPA requested the permit application be elevated for review by the Ports' higher officials. Brigadier General Palladino of the Corps' San Francisco Division Office reviewed the permit decision. Palladino reduced the project by 255 acres and on June 27, 1986 issued his EA, Statement of Findings and Permit Decision on the 180–acre project. Palladino stated that the 180–acre fill did not have a significant impact on the human environment and that an EIS was not required. He directed the Port to purchase the Zunino property, transfer it to Cal.F & G, and enhance the property as Cal.F & G recommended. The Port was required to acquire rights to an additional mitigation property, the Moseley property, which already was a wetland. Title to the Moseley property was not transferred to a public agency. On July 23, 1986, defendant Perkins issued the Corps' permit allowing the Port to fill 180 acres at the Airport.

During the review period, the Corps considered the project's environmental impacts and documented those impacts in the Administrative Record. The Corps relies on agencies to notify the Corps if it had been incorrect or inaccurate in its assessment of the environmental impacts of a project and it interprets a lack of response as "no objection" to the project. The Corps met with governmental agencies to discuss the feasibility of the project. The Corps did not analyze the biological resources on-site,

nor did it analyze the site's hydrological characteristics. The Corps did not extensively evaluate and compare the physical and biological resources at the Zunino or Moseley properties.

The Corps reviewed alternatives to the proposed wetlands fill which included decreasing the size of the project at the Airport. The Corps did not study extensively the possibility of relocating the project to another airport in the vicinity.

The Corps did a cursory study of the increased noise due to additional aircraft. Commercial air traffic at the Airport may raise total daily flight operations at the South Field by as much as one third. The Corps did not consider the nighttime noise levels which would be increased due to the proposed operations. It relied in part on an earlier study which studied an area with less residential construction, fewer flights, and fewer night flights.

The wetlands act as a filtering system for pollutants before draining into the San Francisco Bay. They will not be able to function as a filter, if they are filled. The water flow direction will be changed such that even the wetlands remaining will lose most of their filtering function, and the pollutants will then drain directly into the Bay.

The Corps' mitigation plan does not state the specific conditions of the proposals, how the mitigation plan would operate, or for how long the land would be used for the proposed purposes.

The Corps relied on other agencies' evaluations of the project's cumulative effect of the wetlands and wildlife impacts. The Corps did not discuss the cumulative impacts on air quality, water quality, or the noise pollution in its Decision Document.

## C. STANDARD OF REVIEW AND APPLICABLE LAW

*National Environmental Policy Act*

■ NEPA is an "essentially procedural" statute, [*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)].

Courts enforce NEPA under their authority to hold unlawful and set aside agency action, findings, and conclusions which were made without following legally prescribed procedures [*City of Angoon v. Hodel,* 803 F.2d 1016, 1020 (9th Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987), *quoting Lathan v. Brinegar,* 506 F.2d 677, 692–93 (9th Cir. 1974) (*en banc*); *see also* Administrative Procedure Act, 5 U.S.C. § 706(2)(D)]. The Corps is held to a strict standard of compliance with NEPA [*Friends of the River v. F.E.R.C.,* 720 F.2d 93, 110 (D.C.Cir.1983), *quoting Calvert Cliffs' Coord. Comm. v. United States Atomic Energy Comm'n,* 449 F.2d 1109, 1112 (D.C.Cir.1971)].

■ Courts review the agency's decision not to prepare an EIS by deciding whether the agency has "reasonably concluded" that the project will have no significant adverse environmental consequences [*City and County of San Francisco v. United States,* 615 F.2d 498, 500 (9th Cir. 1980), *quoting City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir.1975) *quoting, Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir.1973)]. The Court need only defer to the agency's judgment, and not substitute its own, when the agency's judgment is "fully informed and well-considered" [*LaFlamme v. F.E.R.C.,* 842 F.2d 1063, 1069 (9th Cir.1988), *quoting Jones v. Gordon,* 792 F.2d 821, 828 (9th Cir.1986)]. The Corps' decision not to prepare an EIS is unreasonable if it failed to supply a convincing statement of reasons why potential effects are insignificant [*The Steamboaters v. F.E.R.C.,* 759 F.2d 1382, 1393 (9th Cir.1985); *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717–18 (9th Cir.1988)].

■ Plaintiffs must prove that "substantial questions" were raised about whether the project will have a significant environmental effect in order to prove that the Corps' decision was unreasonable [*The Steamboaters v. F.E.R.C.,* 759 F.2d at 1392].

Thus, if the Corps reasonably concluded that the 180–acre landfill will not have significant adverse effect on the human environment, no EIS is needed. If the Corps'

decision was unreasonable, the court may remand the decision for further investigation.

## D. VIOLATIONS OF NEPA

### A. *Alternatives considered*

■ As a federal agency, the Corps must provide a discussion of the environmental impacts, not only of the proposed project, but of the alternatives to the proposed project, in its EA [40 C.F.R. § 1508.9(b) (1987); 33 C.F.R. § 230.9(a) (1987)].

The Corps did not evaluate the alternative of relocating some or all of the air cargo project at nearby airports, including San Francisco International, and San Jose airport. It did not complete a detailed analysis of the environmental impacts of these alternative sites. The Corps did not consider changing the project to house only one of the air cargo companies who had requested space at the airport, and thereby shrinking the impact on the wetlands.

These appear to be reasonable alternatives which had to be evaluated by the Corps. By failing to consider and evaluate them, the Corps did not strictly comply with NEPA's requirement to pursue all alternatives to the Oakland Airport site.

### 2. *Environmental Impacts*

The Corps must provide a discussion of the environmental impacts of the project [40 C.F.R. § 1508.9(b)].

It was undisputed at trial that the 180-acre wetlands are very significant. The wildlife at the site is abundant and the site is an important part of the migration trip for the migratory birds.

The Corps did not have adequate information regarding the numbers of birds, specifically the California Least Tern, which are present at the Oakland Airport, to be able to make a fully informed and well-considered decision about the birdlife at the proposed site. The trapping studies of the Salt Marsh Harvest Mouse were not accurate and the decision that the mouse does not exist at the site was not based on the most up-to-date information available to the Corps. Substantial questions were raised regarding the impacts on the Salt Marsh Harvest Mouse and the California Least Tern, both of which are endangered species.

The Corps did not evaluate whether the air cargo buildings, the human traffic, and the airplane and vehicular traffic would add pollutants to the remaining wetlands. If the wetlands are affected by the pollutants, the wildlife in the wetlands will be endangered.

These issues raise substantial questions about the effect on the environment which were not evaluated by the Corps. By ignoring these issues, the Corps violated NEPA's requirements to take a hard look at the impact on wildlife. The Corps could not reasonably conclude that there would not be a significant adverse environmental consequences with the incomplete information the Corps had before it.

### 3. *Noise Impacts*

■ The Corps is required by NEPA to take a hard look at all environmental impacts on the proposed site [40 C.F.R. § 1508.9(b)]. The Corps must independently verify the information it relies upon [*Friends of the Earth v. Hintz*, 800 F.2d 822, 834-35 (9th Cir.1986)].

Expert testimony was given stating that the noise impact would be significant and supporting documentation was presented. Substantial questions were raised about whether the proposed project would have significant noise impacts.

The data the Corps relied upon in making their statement that the project would not measurably increase noise levels beyond the acceptable level in the vicinity of the airport is not in the Administrative Record. The Corps did not see the study it relied upon and instead accepted it at face value. The Corps neither independently verified the data it relied upon, nor did they take a hard look at the noise impacts of the proposed project. Thus the Corps violated NEPA's standards.

### 4. *Water Quality*

NEPA requires the Corps to take a hard look at all environmental impacts on the

proposed project [40 C.F.R. § 1508(b)]. The Corps is required to determine whether the proposed project may have a significant impact on the human environment. The Corps is required to consider the water quality impact.

The Corps did not consider adequately the amount of additional pollutants which might be dispensed into the environment by additional airplanes, automobiles, and pedestrians using the Airport. These pollutants may include oil, grease, toxic metals and suspended solids which may adversely affect the environment.

The Corps did not evaluate the pollutant run-off which will be diverted into the San Francisco Bay, instead of into the wetlands. The wetlands currently act as a filtering system for the pollutants so that they are not drained into the Bay. The proposed wetlands fill will decrease the amount of wetlands available for this filtering process and more of the pollutants will flow into the Bay. This impact was not adequately studied by the Corps.

The Corps did not take a hard look at either the new pollutants which may be found at the proposed site, or the amount of pollutants which will be diverted into the Bay, instead of into the wetlands as a natural filtering system. This lack of investigation violates NEPA's requirements.

### 5. *Cumulative Impacts*

A federal agency must analyze and discuss the cumulative impacts of the proposed action considered together with past, present, and reasonably foreseeable future action [*See* 40 C.F.R. §§ 1508.7, 1508.27 (1987); *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1975)]. The agency must consider other proposals and contemplated actions that are not yet formalized proposals. The agency must also consider actions that are not themselves subject to NEPA's requirements [*See* 40 C.F.R. § 1508.7 (1987); *Fritiofson v. Alexander*, 772 F.2d 1225, 1242–43 (5th Cir.1985)].

The Corps did not complete a cumulative impacts assessment. It did not consider whether other proposals were pending or

whether the historical impact on the Bay area wetlands was significant.

The Corps did not independently evaluate the San Francisco Bay Conservation and Development Commission's report on the amount of tidal and nontidal wetlands, but instead used the information without concern for their lack of understanding of the figures in the report. The Corps was required to independently verify the information it relied upon [*Friends of the Earth v. Hintz*, 800 F.2d at 834–835].

The Corps must review the project in conjunction with all past, present and proposed projects to determine if the project may have a significant impact on the human environment. The Corps' lack of investigation into the cumulative impacts of the proposed project violated NEPA's requirements.

### 6. *Mitigation Plan*

■ The Corps is required to determine the adequacy of the proposed mitigation plan. The mitigation plan must be spelled out, and the effectiveness of the mitigation measures must be demonstrated in advance of the project's approval [*Oregon Natural Resources Council v. Marsh*, 832 F.2d 1489, 1493–94 (9th Cir.1987)]. The Corps must clearly explain how the mitigation plan would mitigate the proposed project's impacts [*LaFlamme v. F.E.R.C.*, 842 F.2d at 1070–71].

The proposed mitigation plan does not document the types of wetlands to be created, the vegetation currently present on the wetlands, the wildlife types which would be benefitted, the source and salinity of the water supplies, or the operation of the water control structures. The mitigation plan does not adequately discuss the cost of the improvements to be made, or how the project will be maintained.

Notwithstanding the elementary concerns of the mitigation proposal, none of the proposed changes are supported by contractual obligations on the Port's part. The Corps did not indisputably show contractual obligation to purchase the proposed land or to fully fund the proposals

made. The Port does not have a binding agreement to maintain the mitigation property for the benefit of the species which are impacted.

The Port is not under contractual obligations to fully perform its promises to procure and enhance the mitigation properties. The Port's mitigation proposal poses great questions as to the adequacy of the mitigation, the feasibility of the creation of the wetlands, and their obligation to maintain them. By leaving these questions unanswered, the Corps violated NEPA's requirements.

### E. CLEAN AIR ACT, CLEAN WATER ACT, RIVERS AND HARBORS ACT

This Court having found that the Corps violated the requirements of NEPA, need not reach conclusions under the Clean Air Act, Clean Water Act, or the Rivers and Harbors Act. As will be discussed, the Corps will be required to prepare an adequate EA or EIS. Any alleged violations of these laws are mooted by the fact that the further filling is enjoined until the necessary investigation and documentation of the environmental impacts of the project are completed.

During the preparation of the EA's and, if necessary, an EIS, the Corps is directed to follow the requirements of the Clean Air Act, the Clean Water Act, and the Rivers and Harbors Act.

### F. REMEDY

■ This Court may determine that the decision to prepare an EIS is reasonable and uphold the EA. On the other hand, the Court may find that the Corps' decision was unreasonable because it did not address fully the environmental issues [*See Fritiofson v. Alexander*, 772 F.2d at 1238]. If the Court finds the decision is unreasonable, the Court may order an EIS or it may remand the case for preparation of a more complete EA [*Id.*, at 1238]. The Court must find a significant impact to trigger the duty to prepare an EIS and the finding that an EA is inadequate does not necessarily require the Court to order an EIS [*Id.* at 1248].

The Ninth Circuit recently overruled a district court's requirement that an agency prepare an EIS. The Court stated that the agency must consider the NEPA requirements and provide a reasoned explanation of whatever course it elects to pursue [*Jones v. Gordon*, 792 F.2d at 829].

This Court finds that the Corps did not adequately address the wetlands, wildlife, and endangered species impacts, water quality impacts, noise impacts, cumulative impacts, or the adequacy of the mitigation proposal. The EAs on these issues are inadequate and the issues must be addressed in more detail to determine whether they will lead to a significant impact on the human environment. If a significant impact on the human environment is found, an EIS will be required under NEPA.

■ The Court finds that there will be substantial harm to the environment if the wetlands are filled before the Corps is able to fully assess the project's impacts. Environmental injury is often irreparable and thus the issuance of an injunction to protect the environment is needed [*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, ____, 107 S.Ct. 1396, 1403, 94 L.Ed.2d 542, 555 (1987)]. The Port believes that it will suffer pecuniary injury, yet pecuniary injury is not an adequate basis for denying injunctive relief [*People ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1316, 1319 (9th Cir.1985)].

The permit issued by the Corps is vacated and set aside. The matter is remanded to the Corps for further investigation in accordance with this opinion. The injunction presently in effect will continue in effect until further order of this Court.